934 F.2d 326
 Unpublished Disposition
NOTICE: Tenth Circuit Rule 36.3 states that unpublished opinions and orders and judgments have no precedential value and shall not be cited except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jonathan SWAPP and John Timothy Singer, Defendants-Appellants.
and
UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,
v.
Addam SWAPP, Defendant-Appellant Cross-Appellee,
 Nos. 88-2433, 88-2435, 88-2516, 89-4090 and 89-4095.
 United States Court of Appeals, Tenth Circuit.
 Sept. 26, 1990.
 
 Before TACHA, BARRETT and BALDOCK, Circuit Judges.
 ORDER AND JUDGMENT*
 BARRETT, Senior Circuit Judge.
 
 
 1
 In these consolidated appeals we review the convictions of co-defendants Addam Swapp (Addam), Jonathan Swapp (Jonathan), and John Timothy Singer (Timothy). A fourth co-defendant, Vickie Singer (Vickie), mother of Timothy and mother-in-law of Addam, appealed, but that appeal was later voluntarily dismissed. The government cross-appeals, challenging Addam's sentence under 18 U.S.C. Sec. 924(c).
 
 Background
 
 2
 In the early morning hours of January 16, 1988, a stake house owned by the Church of Jesus Christ of Latter-Day Saints at Marion, Utah, was extensively damaged when a dynamite device exploded inside it. Addam admitted that he had created the device, placed it in the building, and set it to explode. After setting the device, Addam returned to the Singer property located approximately one mile east of the stake house where he observed the explosion with others residing at the property. Addam resided at the property with his wives, Vickie's daughters (Charlotte and Heidi), Jonathan, Vickie, Timothy, and six children.
 
 
 3
 After an initial investigation of the stake house, which included observing several sets of footprints to and from the stake house to the Singer property, federal agents initiated two phone calls to the Singer residence and spoke with Addam and Vickie. The calls were made to assess the needs of the families and to determine if there were any hostages. Addam related that he had expected the call. Both Addam and Vickie quoted extensively from the Old Testament and indicated that all of the events had been revealed to them by God. Both refused to leave the property.
 
 
 4
 During the course of the following thirteen days, law enforcement agents (agents or officers) surrounded the Singer property. High intensity lights and high powered speakers were set up around the property. The agents played loud noises over the speaker systems and deployed flares in the area of the property in an effort to force the defendants and other inhabitants to leave the property. Shots were fired at the lights and speakers from Vickie's house. Throughout the thirteen-day period, Jonathan and Addam were observed walking around the property with rifles. Several agents testified that Addam and Jonathan pointed their rifles at them.
 
 
 5
 The officers attempted to negotiate with the defendants through Roger Bates, Timothy's brother-in-law, and Ogden Kraut, a friend of the family. After Bates visited with the defendants, he related to the agents that none of the defendants or other occupants of the house wanted to leave. The officers subsequently dropped a letter (from a helicopter) to the defendants. The letter indicated that Addam and Vickie had been indicted by a grand jury for the bombing of the stake house and that there were outstanding arrest warrants for both of them. The letter encouraged the family to surrender peacefully.
 
 
 6
 Thereafter, Kraut offered to act as an intermediary. During his first visit with the family, Addam told Kraut that they were expecting John Singer (Vickie's deceased husband) to be resurrected from the dead as a result of their confrontation with the authorities. During his second visit with the family, Kraut delivered a letter from Utah's Governor Bangerter urging the family to surrender peacefully. During his third visit, Kraut picked up two letters from Addam and Vickie to Governor Bangerter.
 
 
 7
 Within his letter to Governor Bangerter, Addam stated, inter alia, that: he did not recognize the governor as having any authority or jurisdiction over him or his family; the most hideous murderers in this country are the judges, lawyers and doctors; John Singer was murdered by the church and government of Utah; and "we the people of this property are now a nation under God--and are independent and separate from your wicked society of ever changing laws and dark councils...." (R., Vol. XII at p. 781).
 
 
 8
 Within her letter to Governor Bangerter, Vickie stated, inter alia: "I am John Singer's faithful wife. Prophet of God was persecuted and martyred because he would not compromise the truths of Heaven.... We will not give ourselves under the hands of the authorities. They will not take our children for they are an heritage of the Lord and they are children of Zion, the covenant children of the Lord with a promise and the world can't give them anything better than what the Lord has promised." (R., Vol. XII at pp. 775-77).
 
 
 9
 The agents subsequently determined that it would be best to attempt to arrest Addam on the belief that if Addam were captured, the other family members would surrender. A plan was developed which included using trained dogs to subdue Addam. Early on January 28, 1988, Adam and Jonathan, both of whom were armed, left the Singer home to milk a goat. After they finished milking and began walking from the goat pen back to the Singer home, the agents released two dogs. Before the dogs could reach Addam and Jonathan, three shots were fired from the Singer house. One shot killed Lt. Fred House, a dog handler, instantly.
 
 
 10
 When the shots were fired, Addam pulled his rifle off his shoulder and brought it into firing position. Two agents fired at Addam. One bullet hit Addam's wrist, traveled into his chest and lodged in his back. Additional shots were fired from the Singer residence. Although a bullet struck FBI Agent Don Roberts in the chest, he escaped injury when the bullet was deflected by his bullet-proof vest. Addam surrendered a few minutes later and shortly thereafter the entire family surrendered.
 
 
 11
 Timothy was taken into custody and transported to Salt Lake City by two federal agents. During the trip, Timothy gave a lengthy oral statement. He stated, inter alia, that: the church was blown up because no one was listening or cared about the death of his father (John Singer); he believed it was a revelation from the Lord for the church to be blown up; after the church bombing they knew there were a lot of officers surrounding their home because they had seen the reports on television; he did not surrender because to have done so would have meant that he did not believe in the Lord; he had fired ten shots from the Singer house at the dogs but did not know if he hit them; and he did not need to be a marksman because the Lord guided him. (R., Vol. XIII, pp. 1602-06).
 
 
 12
 Addam, Jonathan, Timothy and Vickie were subsequently charged in an eight-count amended superseding indictment. The eight counts and those charged thereunder were: I, knowingly and maliciously damaging and attempting to damage a building with an explosive (Addam and Vickie); II, use of a deadly and dangerous weapon (a bomb) in relation to Count I (Addam and Vickie); III, attempting to kill officers and employees of the FBI (Addam, Jonathan, Timothy, Vickie); IV, use of a deadly and dangerous weapon in relation to Count III (Addam, Jonathan, Timothy, Vickie); V, assaulting, resisting, impeding, intimidating and interfering with officers and employees of the FBI while said employees and officers were engaged in the performance of their official duties (Adam, Jonathan, Timothy, Vickie); VI, use of a deadly and dangerous weapon, i.e., a firearm, in relation to Count V (Addam, Jonathan, Timothy, Vickie); VII, knowingly possessing and aiding and abetting in the possession of a destructive device (a bomb) that had not been registered (Addam, Vickie); VIII, knowingly possessing and aiding and abetting in the possession of a destructive device (a sawed-off shotgun) that had not been registered (Vickie).
 
 
 13
 At trial, the government presented detailed evidence relative to the bombing of the stake house, the thirteen days following the bombing, attempts to persuade the defendants and other family members to surrender peaceably, and the arrests of the defendants. The government's evidence included testimony relative to Timothy's comments to two agents during his transfer to Salt Lake City following his arrest; the twenty-three weapons (handguns, shotguns, and rifles) and 8,304 rounds of ammunition seized from the Singer home and property; and statements of a ballistics expert relative to three rifle shots from a position near the place that Jonathan was observed kneeling and shouldering his weapon, and the recovery of seven projectiles which had been fired from the rifle which Timothy admitted using on the morning of January 28, 1988, including a projectile which hit Lt. House.
 
 
 14
 Addam was the only defendant to testify. Before Addam testified, his counsel and the court voir dired Addam extensively (out of the presence of the jury) relative to his desire to testify, his right not to testify, and the effect thereof. This examination included the following colloquy:
 
 
 15
 Q. (Defense Counsel) You understand the nature of the proceedings here today?
 
 
 16
 A. (Addam Swapp) Yes, I do.
 
 
 17
 Q. And the consequences of your action and the possible imprisonment that you may have?
 
 
 18
 A. I understand more than you give me credit for at this time.
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 The Court: You're conscious of the choices that are available.
 
 
 22
 The Witness: Yes, I am.
 
 
 23
 The Court: And you understand that you can stand mute, remain silent, say nothing and simply put the United States to its proof?
 
 
 24
 The Witness: Yes.
 
 
 25
 The Court: You've considered the alternatives not only with your attorneys but with those who are close to you?
 
 
 26
 The Witness: Yes. I have discussed it with each one of the other defendants in great length. Their attorneys are quite opposed to it, but Timothy, Jonathan, and Vickie are all one hundred percent behind me.
 
 
 27
 (R., Vol. XIV, pp. 1867-69).
 
 
 28
 During his testimony, Addam admitted that he bombed the stake house. Addam also testified, inter alia, that: in bombing the stake house he did not make an effort to hurt or physically harm any person; after the bombing they listened to the mobilization of the law enforcement officials over a bearcat scanner which they had set to the frequencies of the sheriff, highway patrol, and local police department; they had no thoughts of surrendering peacefully because "this people" (law enforcement officials) had proven to be their known enemies; they had received notification from the law enforcement agents to surrender peacefully; he attempted to disable the lights and speakers erected around the property because they tortured him and the others in the house; he never aimed at or tried to shoot any of the law enforcement officials although he had plenty of chances; and he knew the siege was over after he had been shot. (R., Vol. XIV, pp. 1870-79).
 
 
 29
 During cross-examination, Addam repeatedly refused to comply with the orders of the court to answer the questions of the prosecutor. Addam did testify, inter alia, that: he designed the bomb which was comprised of 87 sticks of dynamite and 50 pounds of prill ("like fertilizer"); the bomb weighed between 130 and 140 pounds; the truth was within him but it was not for the prosecutor's ears nor was it for the rest of the prosecution (in response to who went with him to bomb the stake house); when the bomb went off, it looked as if many evil spirits were rising above the chapel; the bombing of the stake house was just the beginning of the destruction of the church, state, and nation; God had told him to stand and fight like a man; he called KUTV on the morning of the bombing and gave a statement in which he related that the Singer property was the last place where God had established a stronghold of the daughter of Zion and that they would not compromise; he and the other defendants had taken a "stand" ("[i]t's something that burns within all four of us.") (R., Vol. XIV, p. 1901) not to compromise; he had approximately twenty guns in Vickie's home during the thirteen days in question; some of weapons in the house included sawed off shotguns which he had "sawed off" himself; most of the weapons were assembled in Vickie's house on January 15 and 16, 1988, and that he owned the weapons; he had fired numerous shots from the house during the thirteen days in question; he never fired at the speakers when the officers were nearby; in his letter to Governor Bangerter he had related that any man crossing the boundary of his property would be treated as an aggressor and that it did not matter if the person had a warrant for his arrest because he did not recognize such warrants; he had declared the Singer compound a sovereign nation; no one ever shot at him or his family while they were out walking around on the property during the thirteen days; and although he heard news reports indicating that the law enforcement authorities wanted a peaceful solution, he couldn't believe it. (R., Vol. XIV, pp. 1891-1932).
 
 
 30
 In response to several questions whether he and Jonathan or Timothy had engaged in certain activity, Addam responded, "I stand mute. If you want to know, ask him." (R., Vol. XIV. at pp. 1912, 1914, 1915). Defense counsel did not object to these questions. However, when the prosecutor inquired of Addam whether he had talked with Timothy about the need for a larger caliber gun, Addam's counsel objected and the court responded that "[w]e'll strike that and we'll indicate to the jury that they should ignore all of such responses here." (R., Vol. XIV, p. 1916).
 
 
 31
 During cross examination, the prosecutor asked Addam to explain his statement to a reporter that it was "the shot heard around the world". (R., Vol. XIV, p. 1933). Addam responded, "The bombing of the church. It was compared to the shot heard around the world." Id. The prosecutor inquired further as to whether his statement concerned the death of Officer House. Addam's counsel objected. The court sustained the objection and admonished the jury to forget the question. Id.
 
 
 32
 On May 9, 1988, the jury returned its verdicts against the four co-defendants, finding: Addam guilty on Counts I, II, IV, V, VI, and VII, and as to Count III, guilty of attempted murder in the second degree; Vickie guilty on Counts I, II, V, VI and VII; Jonathan guilty on Counts IV, V, and VI, and as to Count III, guilty of attempted murder in the second degree; Timothy guilty on Counts IV, V, and VI, and as to Count III, guilty of attempted murder in the second degree.
 
 Contentions on Appeal
 
 33
 a.
 
 
 34
 Addam contends that the district court erred in: (1) denying his motion for a mistrial based on prosecutorial misconduct; (2) denying him the right to interrogate a juror; and (3) denying his motion for a new trial based on comments made by Vickie's defense counsel.
 
 
 35
 (i.)
 
 
 36
 During the government's case, detailed evidence was presented that to Lt. House was struck by a bullet fired from a rifle which Timothy had acknowledged using, that House was rendered unconscious and and had gone into cardiac arrest, and that House had received emergency treatment and was thereafter taken to a hospital. (R., Vol. XII, pp. 853, 856, 859, 944, 961-65, 979-82, 988, 1014, 1026, 1047, 1083; Vol. XIII, pp. 1088, 1093, 1121, 1131).
 
 
 37
 Near the end of the trial, the court ruled that additional comment on Lt. House would not be permitted. In so doing the court noted:
 
 
 38
 The Court: Now there isn't a count relating to Fred House. Fred House is simply not part of this indictment.
 
 
 39
 * * *
 
 
 40
 * * *
 
 
 41
 [T]he fact that Fred House died is simply irrelevant....
 
 
 42
 * * *
 
 
 43
 * * *
 
 
 44
 You can separate it, and we're through talking about Lt. House in this courtroom. The prejudicial effect other than what's in the record already is of such a nature as to render, it seems to me, the probative value far less than it should be.
 
 
 45
 (R., Vol. XIV at pp. 1769, 1771).
 
 
 46
 Notwithstanding these admonitions, the prosecutor did comment on Lt. House's death while cross-examining Addam:
 
 
 47
 Q. (Prosecutor) Now, Mr. Swapp, you told Mr. Wagner, did you not, the Tribune reporter, that you considered a shot to be the shot heard around the world, didn't you?
 
 
 48
 A. (Addam) Yes.
 
 
 49
 Q. What shot was that?
 
 
 50
 A. The bombing of the church. It was compared to the shot heard around the world.
 
 
 51
 Q. Isn't it true that the conversation which you made that statement concerned the death of Officer House?
 
 
 52
 MR. BUCHER: Objection, Your Honor.
 
 
 53
 MR. METOS: I'll object.
 
 
 54
 THE COURT: I'll sustain the objection and I'll strike the question, admonish the jury to forget the question. And counsel should direct his questions in an appropriate fashion. Put your next question.
 
 
 55
 (R., Vol. XIV, pp. 1933-34).
 
 
 56
 Addam argues that the prosecutor's question was particularly prejudicial with respect to Count III (attempting to kill officers and employees of the FBI) because none of the officers testified that he (Addam) fired his weapon or that he (Addam) requested any member of his family to fire on the officers. Addam argues that this question, when taken in context with the other questions propounded to him during cross-examination, was irrelevant and inflammatory and that the combined effect was so prejudicial that no limiting instruction could cure it.
 
 
 57
 The government responds that the question did not assume or imply that Addam was responsible for House's death; Addam had previously testified during direct examination that he had not aimed at or attempted to shoot anyone on January 28, 1988; the question was relevant in establishing Addam's intent; without the armed defiance of Addam, Jonathan, and Timothy, there would have been no bloodshed, forcible resistance, or attempted murder; and, if the question constituted error, it was harmless error which was not sufficient to influence the jury in any appreciable way.
 
 
 58
 Prosecutorial misconduct is not per se reversible error. United States v. Alexander, 849 F.2d 1293, 1296 (10th Cir.1988), quoting United States v. Taylor, 800 F.2d 1012, 1018 (10th Cir.1986), cert. denied, 484 U.S. 838 (1987). We follow the general rule that not all misconduct requires reversal; it is only when such conduct can be said to have influenced the verdict that it becomes prejudicial. Id. It is the duty of the reviewing court to consider the trial record as a whole and to ignore errors that are harmless beyond a reasonable doubt, including most of those involving constitutional violations, United States v. Kornegay, 885 F.2d 713, 718 (10th Cir.1989), cert. denied, --- U.S. ---- (1990), citing United States v. Hasting, 461 U.S. 499 (1983). Applying these standards, we hold that the question did not give rise to reversible error.
 
 
 59
 Prior to this question, the government had presented detailed evidence, without objection, establishing that Lt. House had been struck by a bullet fired from the Singer house, that he fell to the floor unconscious, went into cardiac arrest and was subsequently taken to the hospital. Moreover, prior to the question, Addam had testified that: he had bombed the stake center; they had no thoughts of surrendering peacefully because the law enforcement agents were their "known enemies;" the bombing of the stake house was just the beginning of the destruction of the church, state and nation; he had approximately twenty guns in Vickie's house during the thirteen days in question; most of the weapons were assembled in Vickie's house on January 15 and 16, 1988, and he owned all the weapons; and he had declared the Singer property a sovereign nation.
 
 
 60
 When asked what the statement meant, Addam responded that it referred to the bombing of the church. The prosecutor's subsequent inquiry as to whether the statement concerned the death of Lt. House was argumentative and improper. It was objected to and the court immediately instructed the jury to ignore the question. The record fails to establish that Addam was prejudiced by the question. The totality of the government's evidence was strong. Where the evidence against the accused is strong, the appellant must show that the prejudice he claims constitutes plain error. United States v. Blitstein, 626 F.2d 774 (10th Cir.1980), cert. denied, 449 U.S. 1102 (1981); Hall v. United States, 404 F.2d 1367 (10th Cir.1969).
 
 
 61
 (ii.)
 
 
 62
 Addam contends that the court erred in disallowing him "leave to interrogate a jury who may have been influenced by extraneous matter and not granting a mistrial on that basis." (Opening Brief of Defendant-Appellant, p. 18.)
 
 
 63
 On August 30, 1988, Ronald Miller, a criminal investigator for the Utah Attorney General's Office executed an affadavit in which he stated that juror Fred Lacey had "done some research on his own" the weekend before the jury returned its verdicts. Addam filed a motion for a mistrial based on the affidavit. Two days later the court held a special hearing for the purpose of questioning Lacey:
 
 
 64
 THE COURT: MR. LACEY, let me ask you rather directly: Did you talk with anyone about this case during the days that the jury was deliberating, other than your fellow Jurors?
 
 
 65
 JUROR LACEY: No, I did not.
 
 
 66
 THE COURT: And let me ask you: Did you look at any material relating to this case during the days that the Jury was deliberating, other than that presented in evidence?
 
 
 67
 JUROR LACEY: I did not.
 
 
 68
 (R., Vol. XV at p. 5)
 
 
 69
 Thereafter, the following colloquy occurred between the court and Addam's counsel:
 
 
 70
 THE COURT: What are you going to do with your Motion. Are you withdrawing your Motion?
 
 
 71
 MR BUCHER: I'm withdrawing my Motion. The Motion was filed after I read the Affidavit,--
 
 
 72
 THE COURT: Okay.
 
 
 73
 MR. BUCHER: --and in order to call it for an Evidentiary Hearing in what we've just done in this matter. So it's mooted; or it's not mooted, but it's groundless.
 
 
 74
 (R., Vol. XV at p. 9.)
 
 
 75
 Counsel for Addam subsequently filed a motion for new trial and evidentiary hearing based on his allegations that "it has come to the attention of counsel, that one, or more jury members may have been exposed to extraneous and prejudicial material during or before their deliberations". (R., Vol. VI, Tab 387, p. 1). No evidence or facts were proffered to support the motion. The court denied the motion finding that "the defendant has not even made a sufficient preliminary showing to justify further inquiry into possible extrinsic influences on the jury in this case". Id. at p. 2.
 
 
 76
 On appeal Addam does not challenge the court's finding that he failed to make "a sufficient preliminary showing to justify further inquiry." Rather, Addam argues only that the court did not allow an extensive examination of the juror.
 
 
 77
 A trial court has a great responsibility and wide discretion in dealing with a motion for new trial based on allegations of juror misconduct. United States v. Bradshaw, 787 F.2d 1385, 1390 (10th Cir.1986), quoting United States v. Jones, 707 F.2d 1169, 1173 (10th Cir.1983), cert. denied, 464 U.S. 859 (1983). Something more than unverified conjecture is necessary to justify the grant of a new trial on the basis of juror misconduct where only potentially suspicious circumstances are shown; the trial court's decision will be upheld absent an abuse of discretion. Id. We hold that the court did not abuse its discretion in denying Addam's motion.
 
 
 78
 (iii.)
 
 
 79
 Addam contends that the court erred in denying his motion for a new trial based on the comments of Vickie's defense counsel that Addam was responsible for acts of vandalism in the neighborhood of Marion, Utah, prior to October 1987.
 
 
 80
 During the closing arguments, counsel for Vickie stated:
 
 
 81
 For all Vickie Singer knows, Addam was planning to erect the red pole on the Main Street of the town and perhaps leave some additional signs or grafitti to attract attention to the anniversary of John Singer's death. After all, he had been doing this type of thing before October 29th.
 
 
 82
 (Tr. Final Argument, p. 118, lines 18-22).
 
 
 83
 Addam did not object to the remarks. On appeal, Addam contends that the comments, "together with the damaging affect [sic] of the prejudicial cross-examination of Addam Swapp ... put the burden of the whole incident with Addam Swapp." (Opening Brief of Defendant-Appellant, p. 21).
 
 
 84
 The government responds that under Rule 52(b), Fed.R.Crim.P., "plain error or defects effecting substantial rights may be noticed although they were not brought to the attention of the court;" Addam did not object to the comments at the time they were made; and that unless Addam can demonstrate that the comments constituted plain error, the court's denial of his motion for new trial on this ground must stand.
 
 
 85
 In analyzing the plain error doctrine under Rule 52(b) in United States v. Young, 470 U.S. 1, 15 (1985), the Supreme Court opined:
 
 
 86
 The plain-error doctrine of Federal Rules of Criminal Procedure 52(b) tempers the blow of a rigid application of the contemporaneous-objection requirement. The Rule authorizes the Court of Appeals to correct only 'particularly egregious errors' ... those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings'.... In other words, the plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'
 
 
 87
 Applying this standard to the facts herein, we hold that the court did not err in denying Addams' motion for a new trial based on the comments of Vickie's counsel. The evidence of Addam's guilt was overwhelming. We are unable to ascertain how, under any conditions, the comments first objected to on appeal could be considered "particularly egregious" or errors which would "seriously affect the fairness, integrity or public reputation of judicial proceedings." On the contrary, it is more likely that the jury paid as little attention to the comments as did Addam's trial counsel.
 
 
 88
 b.
 
 
 89
 Jonathan contends that the court erred in: (1) failing to order further psychological evaluation before declaring him competent to stand trial; (2) admitting extrajudicial statements of Vickie and failing to grant his motion to sever; and (3) denying his motion for a mistrial.
 
 
 90
 (i.)
 
 
 91
 Prior to trial, Jonathan's defense counsel filed several motions which raised the issue of Jonathan's ability and competency to stand trial. Jonathan vehemently opposed the motions. Thereafter, Dr. Groesbeck, a psychiatrist, was retained to examine Jonathan. Jonathan was examined for approximately four and one-half hours over the course of two days. A competency hearing was later held during which Dr. Groesbeck testified that Jonathan was incompetent to stand trial. (R., Vol. IX, p. 398).
 
 
 92
 After Dr. Groesbeck testified, the court allowed Jonathan to personally respond. During his response Jonathan testified that he felt he deserved the opportunity to be examined by another psychiatrist; he understood fully what "is going on here" and the implications; he understood what could and might happen to him; he had the right to stand and face the charges against him; Dr. Groesbeck did not have the right to say, based on his (Jonathan's) religion, that he (Jonathan) was mentally ill; just because a man has faith and believes in God does not mean that he is crazy or does not understand; and Dr. Groesbeck was taking his (Jonathan's) religion and twisting it into a mental illness.
 
 
 93
 After hearing and considering all of the evidence, the court found Jonathan competent to stand trial. In so doing, the court found, inter alia:
 
 
 94
 [T]he court is satisfied as to the ability of the young man to be of assistance in his own defense. The court is in a position to observe, to interrogate, and while giving some interested deference to the material that you presented, the fact that one understands what one is doing and manifests that with what appears to be adequate recognition as to consequences, and even though one may disagree with those who are in a position to advise him, the fact that he may disagree and fail to follow suggestions in and of itself, in my opinion, doesn't rise to the level of the status that you suggest it might ... I think under the circumstances there's an adequate manifestation as to an understanding as to, one, the charges. Two, the consequences. And three, perhaps some basic disagreement as to the manner in which particular items ought to be treated.
 
 
 95
 (R., Vol. IX at pp. 528-529).
 
 
 96
 Where the district court has held a hearing and thereafter found that a defendant is competent to stand trial, that finding will not be set aside unless it is determined to be clearly erroneous or arbitrary. United States v. Crews, 781 F.2d 826, 833 (10th Cir.1986).
 
 
 97
 Jonathan's responses to the court were clear, direct, and to the point. Moreover, Dr. Groesbeck acknowledged that Jonathan functioned fairly well with respect to his ability to record, recall, and relate. Dr. Groesbeck also testified that "in terms of memory and ordinary day-to-day activities I think he functions quite well. In fact I think that he's super sensitive." (R., Vol. IX at p. 416). Under these circumstances, we hold that the court's finding that Jonathan was competent to stand trial was not clearly erroneous or arbitrary.
 
 
 98
 (ii.)
 
 
 99
 Jonathan contends that the court erred in admitting extrajudicial statements of Addam and Vickie and that the admission of the statements violated his constitutional right of confrontation under the Sixth Amendment. In particular, Jonathan challenges the admission of Vickie's statement to Doug Palmer, a newspaper reporter, and Addam's statement to Charles Gibbs, an editor with KUTBV.
 
 
 100
 During her conversation with Doug Palmer, Vickie related:
 
 
 101
 We are not going to make peace with them. We will not surrender. We've gone beyond talk. We are going into battle. This is serious I have talked my guts out for years. Talking is over with. We're going into battle. Yes, there will be death, killing. Nothing we can do but protect ourselves. The Lord means what he says.
 
 
 102
 (R., Vol. XI, p. 425).
 
 
 103
 During his conversation with Charles Gibbs, Addam related:
 
 
 104
 We are making a stand against this corruption and wickedness. Our liberties and our God given rights have been tramped on long enough.... The stand that we are making is greater than the stand of the signers of the Declaration of Independence. The Lord has given a commandment that we should stand and fight manfully, and we have been assured that the Lord will fight our battles.... [w]e will be victorious. These people will not believe their eyes.
 
 
 105
 (R., Vol. XI, pp. 451-452).
 
 
 106
 Jonathan argues that inasmuch as both statements used the terms "we," "our" and "us," the jury could reasonably infer that Addam and Vickie were talking about, representing, and describing the acts of all the defendants. This, according to Jonathan, allowed the jury to infer that he had concurred in and participated "in the incriminating actions expressed in the co-defendants' statements," in violation of his constitutional right of confrontation under the Sixth Amendment. (Appellant's Opening Brief, p. 26). The government responds that Jonathan's constitutional rights were not violated when, as here, Addam testified and was available for cross-examination, the statements of Addam and Vickie did not directly refer to or inculpate Jonathan, and much of Jonathan's criminal conduct occurred after the statements were made.
 
 
 107
 Both parties rely on Bruton v. United States, 391 U.S. 123 (1968) and Richardson v. Marsh, 481 U.S. 200 (1987). In Bruton, a non-testifying co-defendant's confession inculpating the defendant was admitted into evidence in a joint trial. The trial court instructed the jury to disregard the confession in determining the defendant's guilt or innocence. The Supreme Court held that the admission of "powerfully incriminating extrajudicial statements" violated the defendant's right of cross-examination under the Sixth Amendment. 391 U.S. at p. 135. In so holding, the Court recognized, however:
 
 
 108
 Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. 'A defendant is entitled to a fair trial but not a perfect one.' It is not unreasonable to conclude that in many cases they jury can and will follow the trial judge's instructions to disregard such information. (Citations omitted).
 
 
 109
 Id.
 
 
 110
 Bruton is applied only where the extrajudicial comments are "clearly inculpatory as to the complaining co-defendants and [are] vitally important to the government's case." United States v. Espinosa, 771 F.2d 1382, 1399 (10th Cir.1985), cert. denied, 474 U.S. 1023 (1985). Bruton was clarified in Richardson v. Marsh, 481 U.S. 200, 211 (1987), where the Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."
 
 
 111
 Applying Bruton and Richardson to the case at bar, we hold that the admission of the statements was not in violation of Jonathan's rights under the confrontation clause of the Sixth Amendment. Initially, the court instructed the jury (prior to the receipt of the statements) that the statements were to be considered only in reference to Vickie and Addam. (R., Vol. XI, pp. 421 and 450). Neither statement was a confession. Neither statement made any reference to Jonathan's name or existence. Moreover the statements were not "vitally important to the government's case" against Jonathan. Rather, the statements were no more than pronouncements of Addam's and Vickie's personal and religious beliefs.
 
 
 112
 Included within Jonathan's argument that Addam's and Vickie's statements violated his rights under the Sixth Amendment confrontation clause, is his contention that the cumulative impact of Addam's and Vickie's statements justified his severance motion and that the court erred in denying it. Severance is justified only in extreme cases. United States v. Rogers, 899 F.2d 917, 926 (10th Cir.1990). A trial court's decision to deny a motion for severance will not be disturbed on appeal absent an affirmative showing of an abuse of discretion. United States v. Williams, 897 F.2d 1034 (10th Cir.1990). This is not an extreme case warranting severance and Jonathan has failed to make an affirmative showing that the court abused its discretion in denying his motion for a severance.
 
 
 113
 (iii.)
 
 
 114
 Jonathan contends that the court erred in denying his motions for a mistrial based on Addam's comments. As set forth supra, Addam was the only defendant who testified. During the course of cross-examination, Addam refused to answer several questions about whether he and Jonathan or Timothy had engaged in certain activities. (R., Vol XIV, pp. 1912, 1914-15). Addam also suggested, in response to several questions, that the prosecutor should ask the co-defendants, including Jonathan, directly about their involvement. Addam further testified that he had discussed taking "a stand" with all the defendants and that "[i]t's something that burns within all four of us." (R., Vol XIV, p. 1901).
 
 
 115
 Jonathan argues that Addam's responses and testimony amounted to impermissible comments on his decision not to testify and that the appropriate "remedy to cure a constitutional violation of this magnitude is reversal." (Appellant's Opening Brief at p. 31).
 
 
 116
 The government responds that Addam's testimony did not give rise to a violation of Jonathan's decision not to testify, that Addam did not attempt to blame Jonathan for any wrongdoing, and that there was no comment by Addam, the prosecution, or anyone else relative to Jonathan's decision not to testify. We agree.
 
 
 117
 The assertion "of the Fifth Amendment privilege 'is properly no part of the evidence submitted to the jury, and no inferences whatever can be legitimately drawn from them from the legal assertion by the witness of his constitutional right.' " United States v. McClure, 734 F.2d 484, 491 (10th Cir.1984), quoting Johnson v. United States, 318 U.S. 189, 196 (1943). The Fifth Amendment's prohibition against commenting to the jury upon the defendant's decision not to testify is violated only when "the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Gomez-Olivas, 897 F.2d 500, 503 (10th Cir.1990), quoting Knowles v. United States, 224 F.2d 168, 170 (10th Cir.1955). Moreover, a defendant is entitled to a fair trial, not a perfect one. Lutwak v. United States, 344 U.S. 604, 619 (1953).
 
 
 118
 Applying these standards to the facts herein, we hold that Addam's comments and responses can not be considered or construed as impermissible comments on Jonathan's decision not to testify. None of Addam's responses and comments "would naturally and necessarily ... [be interpreted by the jury as a] comment on the failure of the accused to testify."
 
 
 119
 (c.)
 
 
 120
 Timothy contends that the court erred in (1) denying his motion to suppress evidence of his confession to law enforcement agents and (2) failing to grant a mistrial based on Addam's responses during cross-examination.
 
 
 121
 (i.)
 
 
 122
 Timothy contends that the court erred in denying his motion to suppress his confession.
 
 
 123
 As set forth, supra, following his arrest, Timothy was transported from the Singer property to Salt Lake City. At the outset of the trip, Timothy was advised of his Miranda rights. Thereafter, he signed a waiver of rights form and began answering questions about the bombing. Within a short period of time, however, Timothy related to the agents that he did not feel like talking about the bombing further. All discussion ceased for thirty to sixty seconds. Then one of the agents indicated that the siege had been very stressful for him and that he wanted to get back to his family in Texas. Timothy expressed surprise that that some of the agents were from out of state. He also related that the siege had been a long ordeal for himself and his family. Subsequent thereto, Timothy agreed to describe the background leading up to the bombing.
 
 
 124
 Once Timothy arrived at the United States Marshall's office, he was reminded of his Miranda rights. Thereafter Timothy gave a detailed confession which was tape recorded. Prior to trial, Timothy moved to suppress his confession. During a motion hearing Timothy testified, inter alia, that: he had been confined to a wheelchair since he was seventeen when a tree fell on him; he was removed from public schools when he was five and thereafter educated by his mother and father at home; his father was shot and killed during an attempted arrest; he had no prior experience or education in relation to criminal law; he was angry and upset at the time of his arrest; and he did not understand his Miranda rights and did not realize that his statements could be used against him.
 
 
 125
 Michael DeCaria, a psychologist, testified that: he had examined Timothy; as a result of his interview, tests, and examinations, he had concluded that Timothy was very susceptible to coercion; Timothy was unable to make decisions based on rational intellect; Timothy was unable to exercise his own free will; and Timothy would have been unable to make a knowing and intelligent waiver of a constitutional right.
 
 
 126
 The government presented the testimony of the agents who had transported Timothy to Salt Lake City along with the testimony of Doris Read, a clinical psychologist who had examined Timothy. Read testified, contrary to DeCaria, that there was no evidence to suggest that Timothy was unable to comprehend the warnings that he had received from the agents. Read also testified that Timothy had told her that he had read and understood the Miranda form which he signed.
 
 
 127
 In denying Timothy's motion to suppress, the court found:
 
 
 128
 Now, John Timothy Singer's motion to suppress.... Examining the testimony again of those who had physical custody of him, there's no question as to the event of the Mirandizing, the execution of the document, the subsequent reminding. There were other questions raised, but I after looking at all of the material and examining the material that's been furnished to the court in all of its forms, and in listening as well as observing that material, I'm of the opinion that I should deny the motion....
 
 
 129
 * * *
 
 
 130
 * * *
 
 
 131
 I'm perfectly satisfied that they [agents] were very, very careful. That they were careful on the manner in which they proceeded. I was impressed with that. I'm also satisfied that there was good understanding that what was done was knowingly done and voluntarily done with good understanding. And I had some concerns in that area, but I've satisfied myself.
 
 
 132
 (R., Vol. IX at p. 525).
 
 
 133
 Timothy contends that his confession was involuntary and was not the product of his free and unrestrained choice. Timothy argues that his confession should not have been admitted when, as here, the agents failed to honor his assertion of his privilege against self-incrimination, and that he is entitled to a new trial.
 
 
 134
 A confession is admissible only if it is voluntarily made. If a confession is the product of "an essentially free and unrestrained choice by its maker ... if he has willed to confess, it may be used against him". Culombe v. Connecticut, 367 U.S. 568, 602 (1961). The constitutional guarantee is only that the witness not be compelled to give self-incriminating testimony; the test is whether, considering the totality of the circumstances, the free will of the witness was overborne. United States v. Washington, 431 U.S. 181, 187 (1977). Furthermore, once an accused in police custody terminates his interview, further interrogation should not take place "unless the accused himself initiates further communication, exchanges, or conversations with the police" or unless the "suspect himself initiates dialogue with the authorities." Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983), quoting Edwards v. Arizona, 451 U.S. 477, 485 (1981) and Wyrick v. Fields, 459 U.S. 42, 46 (1982).
 
 
 135
 When reviewing the denial of a motion to suppress, the trial court's findings of fact must be accepted unless they are clearly erroneous. United States v. Ellison, 791 F.2d 821-22 (10th Cir.1986), citing United States v. Leach, 749 F.2d 592 (10th Cir.1984). Evidence deduced at the suppression hearing must be viewed in the light most favorable to the government. Id.
 
 
 136
 Viewing the evidence in the light most favorable to the government, we hold that the district court's findings in support of its denial of Timothy's motion to suppress were not clearly erroneous. Although the evidence was conflicting, there was sufficient evidence from which the district court could find, as it did, that Timothy's confession was knowingly and voluntarily made with an understanding of the effect of the confession.
 
 
 137
 (ii.)
 
 
 138
 Timothy contends that the court erred in failing to grant a mistrial based on Addam's responses during cross-examination. This contention is identical to Jonathan's third allegation of error, (b)(iii), supra.
 
 
 139
 During Addam's cross-examination, he was asked several questions relative to Jonathan's and Timothy's actions during the siege. (R., Vol. XIV, pp. 1913, 1915-16). In each instance, Addam declined to answer and suggested that the prosecutor "ask him," referring to Jonathan and/or Timothy. Timothy argues that these comments constituted a negative comment on the exercise of his constitutional right not to testify and that his conviction should be reversed.
 
 
 140
 We hold that Addam's responses did not constitute an improper comment on Timothy's decision not to testify. See (b)(iii), supra.
 
 Cross-Appeal
 
 141
 The government contends that the district court erred in not sentencing Addam to a five year term under Count II in accordance with 18 U.S.C. Sec. 924(c). We agree.
 
 
 142
 Addam was convicted on seven counts, including Count I, knowingly and maliciously damaging and attempting to damage a building with an explosive, in violation of 18 U.S.C. Secs. 844(i) and (ii), and Count II, use of a deadly and dangerous weapon in relation to Count I, in violation of 18 U.S.C. Sec. 924(c)(1). Sec. 924(c)(1) provides in part:
 
 
 143
 Whoever, during and in relation to any crime of violence ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence ... be sentenced to imprisonment for five years.... Notwithstanding any other provision of the law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried. (emphasis supplied).
 
 
 144
 Notwithstanding Addam's convictions under both Counts I and II, the district court determined that Addam should only be sentenced under Count I for violation of Sec. 844(i) and (ii). In finding that Addam should not be sentenced under Count II for violation of Sec. 924(c)(1) the district court found, inter alia:
 
 
 145
 It is fundamental that a defendant may only be convicted of two separate offenses arising from a single act if each offense requires proof of a fact not essential to the other.... In the original sentencing the court imposed a sentence of five years as to Count I and stayed sentence as to Count II on the grounds that to sentence on Count II would be unlawfully cumulative or duplicative of the sentence imposed on Count I. It seemed to the court inappropriate at the time of the original sentencing to sentence twice on the same event, supported by identical proof. It seems even more inappropriate now ... where the pleadings as written require the same proof--where one is to be punished for destroying a building through the use of a bomb and then further punished for destroying the same building through the use of the same bomb--to sentence on both counts is unlawfully cumulative. To do so would impose double punishment.
 
 
 146
 (R., Supp.Vol. I, Tab 456, p. 5).
 
 
 147
 It is uncontested that, under 18 U.S.C. Sec. 924(c)(1), the explosive used to bomb the stake house was a "firearm" and that the bombing of the stake house constituted an "act of violence."
 
 
 148
 The government argues that the language and intent of Sec. 924(c) is clear and unmistakable, i.e., a mandatory five year imprisonment term without the possibility of parole for anyone who uses or carries a firearm during and in relation to a crime of violence. The government argues, quoting United States v. Chalan, 812 F.2d 1302, 1316 (10th Cir.1987), that Sec. 924(c) and its legislative history "indicate that a sentence for violation of Sec. 924(c) should never run concurrently with any other sentence." The government also argues that sentencing Addam under Sec. 924(c) will not violate the double jeopardy clause as interpreted in Blockburger v. United States, 284 U.S. 299 (1932) (defendant may not be punished twice for the same offense) when, as here, Congress has specifically authorized cumulative punishment.
 
 
 149
 Addam responds that the court did not err in refusing to sentence him under Count II when the same evidence was introduced for both counts. Addam argues that, under Blockburger, the double jeopardy clause is violated if a defendant is sentenced for two offenses predicated on the same facts; such is the situation in the case at bar inasmuch as there is no added fact or element differing Count I and Count II; and under the rule of lenity, the district court should be afforded the discretion to defer a cumulative sentence.
 
 
 150
 We hold that the court erred in failing to sentence Addam under Sec. 924(c) following his conviction of Count II. A sentence under Sec. 924(c) is not discretionary; "[a defendant] shall, in addition to the punishment provided for such crime of violence ... be sentenced to imprisonment for five years...." See United States v. Chalan, 812 F.2d at p. 1315. Nor does the imposition of a five-year sentence under Sec. 924(c) violate the double jeopardy clause as interpreted in Blockburger.
 
 
 151
 In Blockburger, the Court held that multiple punishments can not be imposed for two offenses arising out of the same criminal transaction unless each offense requires proof of a fact that the other does not.
 
 
 152
 Blockburger was clarified in Whalen v. United States, 445 U.S. 684, 691-693 (1980) in which the Court held:
 
 
 153
 The assumption underlying the rule [in Blockburger ] is that Congress does not intend to punish the same offense under two different statutes. Accordingly, where two statutory provisions proscribe the 'same offense,' they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent.
 
 
 154
 * * *
 
 
 155
 * * *
 
 
 156
 [w]here the offenses are the same ... cumulative sentences are not permitted unless elsewhere specifically authorized by Congress. (emphasis added).
 
 
 157
 Blockburger was further clarified in Albernaz v. United States, 450 U.S. 333, 340 (1981) in which the court noted that inasmuch as the "Blockburger test is a 'rule of statutory construction,' and because it is serves as a means of discerning congressional purpose, the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent." Albernaz and Whalen were cited with approval in Missouri v. Hunter, 459 U.S. 359, 368-369 (1983) in which the Court held:
 
 
 158
 Where, as here, a legislture specifically authorizes cumulative punishments under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under Blockburger, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.
 
 
 159
 Inasmuch as Congress specifically directed cumulative punishment under Sec. 924(c), the district court was, following Addam's conviction under Count II, obligated to sentence him to an additional five years imprisonment, without probation, to run consecutively with his other terms of imprisonment.
 
 
 160
 The convictions of Addam Swapp, Jonathan Swapp, and Timothy Singer are AFFIRMED. The case of Addam Swapp is REMANDED for further sentencing pursuant to Sec. 924(c)(1).
 
 
 
 *
 This Order and Judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3